467 P.2d 66

**STATE of Arizona ex rel. Justin HERMAN, Director, Arizona Highway Department, Appellant,**

**v.**

**Enos P. SCHAFFER, as his sole and separate property, et al., Appellees.**

**No. 9836–PR.**

Supreme Court of Arizona,
In Banc.

March 26, 1970.

Rehearing Denied April 28, 1970.

Gary K. Nelson, Atty. Gen., Darrel F. Smith, former Atty. Gen., William Kimble, Sp. Asst. Atty. Gen., for appellant.

Dunseath, Stubbs & Burch, by Robert C. Stubbs, Hirsch, Van Slyke & Ollason, by Gerald B. Hirsch, Tucson, for appellees.

McFARLAND, Justice:

The State of Arizona filed this action in eminent domain against seventeen parcels of land located along Interstate Highway 10, formerly known as the Casa Grande Highway, U.S. 80, in the Jane's Station area northwest of Tucson. All of the properties abutted both sides of the highway along a one-and-one-quarter-mile strip

between Sunset Road and Ruthrauff Road. Prior to its conversion to a limited-access highway, U.S. 80 was a divided road with certain designated crossovers. Along the one-and-one-quarter-mile strip in question there were seven such crossovers put in by the State in accordance with an agreement with the property owners, made at the time the State acquired the right of way. Thus all of the properties had direct access to both the northbound and southbound lanes of traffic.

Interstate 10 was constructed entirely within the existing right of way so that it was not necessary to take any land. However, the crossovers were eliminated, and a fence was constructed along the sides of the highway, thereby eliminating the property owners' direct access to the mainstream of traffic. But the State constructed two-way frontage roads on either side of the highway, on which roads all of the properties abutted. The ramps connecting to the frontage roads were located about a half mile to the north and south of the subject properties.

Thus, for example, a motorist proceeding north towards Phoenix would leave the main highway approximately 2,000 feet south of Ruthrauff Road via a ramp, straight ahead to the easterly frontage road. If he sought to visit one of the businesses on the other side, or westerly side, of the highway he would turn left on Ruthrauff Road, pass under the highway and turn right directly onto the frontage road. Because both frontage roads are two way, a traveller need not retrace his steps to return to the main highway, but can continue in the same direction to rejoin the mainstream of traffic. Again, for example, the motorist travelling north towards Phoenix can, after stopping at one of the properties involved, continue in the same direction some 2,000 feet to Sunset Road and rejoin the mainstream of traffic.

On March 29, 1965, the trial court ordered that the issues raised by the State's claim for declaratory relief be tried separately with the issue of damages to abide

the decision. The State's claim was tried to the court on December 21, 1965, and, on March 8, 1966, the court rendered its decision that the State's action in limiting access to the properties constituted a taking of private property, and was compensable. A jury trial to determine damages was ordered.

On March 18, 1966, two defendants, owning four parcels of land, moved to sever their action from the others, and on April 28, 1966, the court granted the motion and fixed October 3, 1966, as the date of trial. On March 22, 1966, the remaining defendants moved for separate trials, which was denied on April 28, 1966, and November 14, 1966, was set as the trial date.

On October 17, 1966, the jury returned a verdict in favor of the State and against the first two of the defendants. On February 3, 1967, after 34 days of trial, the jury returned verdicts in favor of the State and against the defendants, Schaffer, Megna, Lewis, Honnas, Runnels, Davis, Stroh, Eicholtz, and Hague (Tucson Truck Service). It also returned verdicts in favor of Vick in the amount of $8,000; Soloman in the amount of $10,000; Davis in the amount of $8,000, and Hague (Hague Truck Stop) in the amount of $10,000.

Subsequently, all the parties involved filed motions directed to the verdict and judgment, including motions for a new trial by the defendants. The State moved for judgment N. O. V., which was denied. The motions by the defendants, Arizona Land Title & Trust Company and Jeter were denied by Judge Garrett. Subsequently, Judge Collins granted the motion for a new trial for the remaining defendants on the following grounds:

"1. That the verdicts granted insufficient damages to the defendants;

"2. That the verdicts were not justified by the evidence;

"3. That there was error in the admission and rejection of evidence;

"4. That there was error in giving and refusing instructions;

"5. That the verdicts were contrary to law;

"6. That it was improper for Judge Garrett to deny defendants' Motion for Separate Trials."

The motion referred to in number 6 was the motion of March 22, 1966, which Judge Garrett denied on April 28, 1966.

The State appeals from this order, and from the order denying its Motion for Judgment N. O. V. We take the latter question first.

It is the State's position that controlling direct access to an interstate highway is an exercise of its police power, not eminent domain, and is not a taking of property so as to be compensable.

A limited access highway has been defined as follows:

"A limited-access highway, sometimes referred to as a thruway or a freeway, is not an ordinary highway but an entirely new concept in highways which has made its appearance in recent years as a result of the many changes in the lives and mobility of the general public brought about by the introduction and increasingly prevalent use of the automobile. It is a highway where ingress and egress may be had only at certain designated points which are to be determined by the highway authorities. The very purpose of such roads is to provide fast and safe through traffic. To bring this about, it is necessary that there be limited access to the highway, thereby eliminating danger of accidents and also affording economic advantages which would best serve the public interests. Limited-access highways are of no use, however, if the public is not provided reasonable means to enter and leave the highway system. It is imperative, therefore, that although the access be limited, reasonable access also be granted to those requiring use of the highway. It is for this reason that most acts providing for limited-access highways authorize the construction of supplementary

service roads." 3 Nichols, Eminent Domain, p. 386 (3d.Ed.)

There is no argument that the State has the authority to limit access in the construction of such a highway. The problem arises as to whether such action is compensable, and there is a great diversity of opinion among the courts of the several States.

"The decisions of the courts seem to fall into three major categories:

"(1) That any loss which results from being placed upon a frontage road is not to be compensated in eminent domain whether land is taken or not;

"(2) That any loss resulting from being placed on a frontage road should be compensated but the frontage road should be considered in mitigation;

"(3) That any loss resulting from being placed on a frontage road should be compensated only when accompanied by a taking of land, and that the existence of a frontage road should be considered in mitigation." Nichols, supra, at pp. 387–88.

There are two areas, however, where there is more agreement between the courts. Where a limited-access highway is constructed on a new location—as contrasted with using the existing right of way—neither the new abutting owners nor the ones abutting on the former highway, which becomes a service road, are entitled to compensation. See State ex rel. Morrison v. Thelberg, 87 Ariz. 318, 350 P.2d 988; Lehman v. Iowa State Highway Commission, 251 Iowa 77, 99 N.W.2d 404. Also, there is generally more agreement that compensation is due where the limitation amounts to a complete destruction of the abutter's practical access. See e.g.: Smith v. State Highway Commission, 185 Kan. 445, 346 P.2d 259; Carazalla v. State, 269 Wis. 593, 70 N.W.2d 208, 71 N.W.2d 276.

It is in the latter area that the basis for a solution to the problem may be found if we add to the requirement of "complete destruction" the added condition that the ingress and egress to the limited-access highway as provided by a frontage road be not so circuitous as to be unreasonable.

We hold—in agreement with the ever-increasing trend of authority—that *direct* access to a highway is not a private property right within the contemplation of Article 2, Section 17 of the Arizona Constitution, A.R.S., which provides, in part:

"* * * No private property shall be taken or damaged for public or private use without just compensation * * *."

We incline towards the reasoning expressed by the Kansas Supreme Court in Brock v. State Highway Commission, 195 Kan. 361, 404 P.2d 934:

"In support of the above contention the appellants argue that 'the construction of a frontage road between a landowner's property and a pre-existing public highway is the taking of the common law right of direct access as a matter of law.' Some of our decisions cited by appellants, and which will be considered later, would appear to support their argument. However, it would also appear that controlled access highways, and the necessity therefor, under our modern addiction to increased speed on the highways, has created an entirely new concept not known at the time the common law or case law was developed.

"This new concept, which was not fully recognized in our previous decisions, requires a complete review and reappraisal of the correlative rights of the general public and owners of abutting lands where controlled access highways are reasonably necessary to protect the safety and convenience of the traveling public.

*      *      *      *      *      *

"We adhere to the rule that the owners of abutting lands have a right of access to the public road system but it does not follow that they have a right of direct ingress and egress to and from a controlled access thoroughfare. The right of access, if it can be determined to be a right under such circumstances, is

the right to reasonable, but not unlimited, access to and from the abutting lands.

"Although an abutting landowner has a right to use a highway he cannot be heard to say that he has been deprived of his right or compensably damaged because he does not have direct access to a certain highway where public judgment dictates that access to and from the highway should be controlled and is subject to control under the police power of the state.

"The appellants complain that they do not have direct access from their property to the highway. The property abuts on a frontage or service road. Appellants have access to the frontage road at all points at which it abuts their property. There is no suggestion that the frontage or service road is not of proper quality. It is part of the state highway system. Appellants are granted access to the main highway at the east and west ends of their property. Appellee has constructed cross-over openings for their special use and benefit. Such cross-over openings are only 575 feet apart.

"Circuity of travel, necessarily and newly created, to and from real property, does not of itself result in legal impairment of the right of ingress and egress to and from such property and a controlled access highway.

"The common complaint is made here that following reconstruction, the bulk of traffic traveled on the main highway with no direct access to claimants' property from the thoroughfare. As for diversion of traffic, an abutting owner has no right to the continuation of a flow of traffic in front of his property. The state's exercise of its police power in such situations is predominant and controlling. The owner of abutting land has no property right in the traveling public using the highway. The state may abandon or reroute an existing highway without any liability to the owners of abutting lands.

"The increasing number of accidents and vehicles on our highways cogently indicates the necessity of having a highway system which affords safety and permits the free flow of traffic. Such a system requires traffic control devices such as limited access highways, one-way streets, express thoroughfares, medial dividers, barrier curbs and the like. These and other traffic control devices may, on occasion, place a restriction on an abutting property owner's free and convenient access to his property, but as long as the restriction is reasonable the courts will not interfere.

"We are forced to conclude that appellants were not denied access to the highway system since the frontage road itself is a part of the highway system to which appellants admittedly have access at all points at which it abuts their property. The frontage road in turn provides them access to the through-traffic lanes by points of connection between the frontage road and the through-traffic lanes of U.S. Highway 24."

See also Ray v. State Highway Commission, 196 Kan. 13, 410 P.2d 278, cert. den. 385 U.S. 820, 87 S.Ct. 43, 17 L.Ed.2d 57; Carazalla v. State of Wisconsin, supra; State v. Jordan, 247 Ind. 361, 215 N.E.2d 32; State ex rel. State Highway Commission v. Meier (Mo.) 388 S.W.2d 855, cert. den. Mohr v. State Highway Comm., 382 U.S. 846, 86 S.Ct. 79, 15 L.Ed.2d 86; State ex rel. State Highway Commission v. Brockfeld (Mo.) 395 S.W.2d 232; McKenna v. State Highway Commission, 28 Wis.2d 179, 135 N.W.2d 827.

■ It is generally conceded that regulation of traffic on highways and roads falls under the police power of a State. Under this heading comes restricting traffic to one-way travel, regulating parking, limiting size, weight and type of vehicles, proscribing speed limits, building highway dividers and prohibiting left turns. In

Rayburn v. State ex rel. Willey, 93 Ariz. 54, 378 P.2d 496, we said:

"While there can be no doubt from the evidence that the alteration in the traffic flow on Twenty-third Avenue and Buckeye Road as they abut the appellant's property adversely affected her from a pecuniary standpoint, it is well established that not all elements of damage resulting from a highway improvement are compensable. State ex rel. Sullivan v. Carrow, 57 Ariz. 434, 114 P.2d 896. The cases are virtually unanimous in holding that an owner is not entitled to compensation when the traffic flow on an abutting street is converted from two-way traffic to one-way traffic only, Walker v. State, 48 Wash.2d 587, 295 P.2d 328; State v. Peterson, 134 Mont. 52, 328 P.2d 617; People ex rel. Dept. of Public Works v. Ayon, 54 Cal.2d 217, 5 Cal.Rptr. 151, 352 P.2d 519; or when a traffic divider or island is constructed on the abutting street, Holman v. State of California, 97 Cal.App.2d 237, 217 P.2d 448; People v. Sayig, 101 Cal.App.2d 890, 226 P.2d 702; State v. Fox, 53 Wash.2d 216, 332 P.2d 943; Springville Banking Co. v. Burton, 10 Utah 2d 100, 349 P.2d 157; Dept. of Public Works & Bldgs. v. Mabee, 22 Ill.2d 202, 174 N.E.2d 801."

See also, Hendrickson v. State, 267 Minn. 436, 127 N.W.2d 165.

■ It is equally well-established that an abutting owner has no vested interest in the unobstructed and unchanging flow of traffic in front of his premises. Rayburn v. State ex rel. Willey, supra. In State v. Meier, supra, the court stated:

"Respondent, as an abutting property owner on a public highway, does not now have and has never had any other property interest in the public highway other than a reasonable right of ingress and egress, as stated. Respondent has never had a property right in the traffic, great or small, on the highway, nor a right to recover damages for a decrease in value of her premises by reason of the diversion of traffic away from her property, nor has she had a property right to have the same amount of traffic pass her property as before or to have it move in the same direction. Respondent's property right of access has never extended further than the right to enter *upon* the highway or to leave it and have reasonable connection to the public road system. * * *"

■ We fail to perceive any difference in principle between the foregoing situations and one where the State, in the interest of the public, regulates high-speed traffic by limiting access. This was well expressed in a concurring opinion in Ray v. State Highway Commission, supra, 410 P. 2d at 287:

"The supervision of public safety is a governmental power, continuing in its nature, to be exercised through the police power as the special exigencies of the moment may require, and the largest legislative discretion is allowed. We have held that the legislature has plenary power over highways and it is well settled that their use may be limited, controlled and regulated in the exercise of the police power whenever necessary to promote the safety and general welfare of the people. Hence, the regulation of traffic under the police power includes such things as prohibiting left turns, prescribing one-way traffic, prohibiting access or crossovers between separate traffic lanes, prohibiting or regulating parking, and restricting the speed, weight, size and character of vehicles allowed on certain highways. (State ex rel. v. St. Louis-S. F. R. Co., 124 Kan. 433, 260 P. 980; State ex rel. Arn v. State Commission of Revenue and Taxation, 163 Kan. 240, 247, 181 P.2d 532; Riddle v. State Highway Commission, 184 Kan. 603, 611, 339 P.2d 301; Moore v. State Highway Commission, 191 Kan. 624, 383 P.2d 549; Jones v. Garrett, 192 Kan. 109, 386 P.2d 194; Watson Inc. v. City of Topeka, 194 Kan. 585, 589, 400 P.2d 689.)

"Our Controlled-Access Statute is, in the best sense, a police regulation

deemed essential by the legislature for the protection of the lives and property of our citizens against the unrestrained exercise of any citizen of his own right. It was enacted to meet the needs of social and economic conditions brought about by twentieth century urbanization and the perfection and increased use of the motor vehicle. It calls for a necessary adjustment of two conflicting interests—that of the public using the highways, and that of the abutter and his right of access thereto. Generically, the safe use of the public highways, represents the more important interest of the two. This statute contains broad grants of power and was intended to embrace all details for the safe, convenient and efficient movement of traffic. Its purpose was to have highways designed and constructed in such a manner that their use would not be dangerous to the traveling public. Old highways were to be relocated and reconstructed, and new highways were to be located and constructed. These highways were to be free from abutter's access except at designated interchange areas or crossovers, and were designed primarily to serve the traveling public and only secondarily the land over which they pass. * * *"

Justice Fatzer, in this concurring opinion, summarized what we conclude to be the better-reasoned authority, as follows:

"* * * The question depends upon the particular facts of the case. Obviously, if there is a total blocking of access, the restriction would be unreasonable and the abutter entitled to compensation. (Kansas N. & D. Rly. Co. v. Cuykendall, 42 Kan. 234, 21 P. 1051, 16 Am. St.Rep. 479; Sample v. Board of Com'rs Jefferson County, 108 Kan. 498, 196 P. 440.) Where, however, the restriction does not *substantially* interfere with the abutter's ingress and egress (Iowa State Highway Comm. v. Smith, 248 Iowa 869, 877, 82 N.W.2d 755, 73 A.L.R.2d 680), or where 'frontage' or 'outer roadways' reasonably provide access (Darnall, et al., v. State, et al., 79 S.D. 59, 108 N.W.2d 201;

Nick v. State Highway Comm., 13 Wis. 2d 511, 109 N.W.2d 71, 111 N.W.2d 95) the abutter is not entitled to compensation. While an abutter has the right of access to the public highway system, it does not follow that he has a direct-access right to the main traveled portion thereof; circuity of travel, so long as it is not unreasonable, is non-compensable. (State ex rel. State Highway Comm. v. Lavasek, 73 N.M. 33, 385 P.2d 361; Sample v. [Board of Com'rs] Jefferson County, supra; Gantz v. Board of Com'rs of Jefferson County, 129 Kan. 66, 282 P. 265; Brock v. State Highway Commission, supra.) Likewise, loss of business occasioned by the diversion of traffic is non-compensable. (Heller v. Atchison T. & S. F. R. Co., 28 Kan. 625.)"

Ordinarily, whether the ingress and egress provided by the frontage road is reasonable is a question to be resolved by the trier of fact in the first instance, Hendrickson v. State, supra. However, "when it can be said that reasonable minds could not differ * * * the question becomes one of law for the court to decide * * *." Brock v. State Highway Commission, supra, 404 P.2d at 945 (concurring opinion). Hendrickson v. State, supra, 127 N.W.2d at 172.

The defendants cite our recent decision in State ex rel. Herman v. Wilson, 103 Ariz. 194, 438 P.2d 760, as controlling authority in favor of their position. We disagree. Wilson did not involve a frontage road as the majority pointed out:

"The State argues that access to existing highways may be regulated under the police power of the state where reasonably designed to promote the public safety and welfare. We recognize that there are a number of states which, in recent years, have adopted the principle that the right of direct access to a public highway may be limited to frontage roads and possibly to other circumstances in which access is not unreasonably circuitous. See e. g., Ray v. State Highway

Comm., 196 Kan. 13, 410 P.2d 278; cert. denied 385 U.S. 820, 87 S.Ct. 43, 17 L. Ed.2d 57, 43 A.L.R.2d 1072; Houghs v. Mackie, 1 Mich.App. 554, 137 N.W.2d 289; Moses v. State Highway Commission, 261 N.C. 316, 134 S.E.2d 664; State Highway Commission v. Central Paving Co., 240 Or. 71, 399 P.2d 1019; Stefan Auto Body v. State Highway Commission, 21 Wis.2d 363, 124 N.W.2d 319; and Covey, Frontage Roads: To Compensate or not to Compensate, 56 Nw.U.L.Rev. 587.

"But we do not have such a situation here for there is no frontage road and the substitute access road is, in our opinion, unreasonably *circuitous*. Accordingly we hold, consistent with our former decisions, that the complete destruction of direct access to a public highway constitutes a damaging of property within the meaning of the Constitution of Arizona. Art. II, § 17 A.R.S. See Pima County v. Bilby, 87 Ariz. 366, 351 P.2d 647." [Emphasis added.]

In fact, Wilson was decided on the same principle which pervades many of the authorities which we have cited here; that the ingress and egress after conversion of the highway must not be "unreasonably circuitous." The question of fact as to whether the ingress or egress is reasonable is one on which members of the court may differ, as in Wilson, supra.

■ In the event the trier of fact determines that the ingress and egress is unreasonable, the measure of damages "is the difference between the market value of the abutting property immediately before and immediately after the destruction or impairment thereof." State ex rel. Morrison v. Thelberg, supra; Hendrickson v. State, supra. In the Hendrickson case the court set forth the commonly-accepted rule for damages:

"If the jury determines that plaintiffs are entitled to recover, the measure of damages is the difference between the market value of the property before and

after suitable access has been denied. In awarding damages the jury may consider any change in the highest and best use which may have consequently occurred. For this limited purpose the court may in its discretion receive with caution evidence of lost patronage. However, no damages as such may be assessed for diversion of traffic or for loss of customers, business, goodwill, income, or profits since the latter depend not only on the location of access but on such complex and intangible variables as the initiative and industry of the proprietors. Personal attributes such as these will continue to influence the success or failure of a business enterprise wherever it is located. Hence, the diminution in value of only the real estate is relevant."

■ Read in conjunction with the foregoing, particularly as to the limited use of evidence of lost business, the majority and dissenting opinions in Wilson, supra, can be harmonized. In the majority, it was stated:

"The appellant complains that the court erred in permitting the jury to consider loss of business as an item of damage. While we have said that evidence of business earnings is ordinarily improper in condemnation actions, City of Phoenix v. Consolidated Water Co., 101 Ariz. 43, 415 P.2d 866, it is not every loss of business which is impermissible, Maricopa County v. Shell Oil Co., 84 Ariz. 325, 327 P.2d 1005. Irrespective, we do not understand that Mrs. Wilson's testimony was offered to prove the amount of appellees' damages but to establish that appellees were damaged. Her testimony established that the access rights were valuable and led to the inference that there was a diminution in the highest and best use of the property occasioned by the impairment of access. From such a loss the jury could conclude that the expert's opinion of a reduction in the market value was reasonably supported by facts. In passing, it is to be

noted that the trial court correctly instructed the jury that it was not to consider any claim of loss or impairment of business 'inasmuch as the law permits damages to be awarded for injury to property but not injury to business conducted thereon.' "

The minority stated:

"Thus, it is clear that the rule announced by Thelberg was intended to mean, and should be construed to mean, that the measure of damages, where access is taken or impaired, *is that part of the difference in the before and after market values of the remaining property, which is due to the taking of, or injury to the right of access, not including any damages caused by non-compensable factors.*"

This statement, with that of the majority, was more in the nature of further explanation. Thus, the court may cautiously permit the introduction of evidence of loss of business in order to show "a diminution in the highest and best use of the property," but the damages should not reflect such "non-compensable factors," as set forth in Hendrickson, supra.

■ We hold that under the principles of law, set forth herein, relating to the standards of reasonable ingress and egress, the frontage road provided by the State for the benefit of these defendants was not unreasonably circuitous. Therefore, the limitation of access is not compensable.

■ However, a contractual element is injected into this case. The defendants claim, and the State concedes, that the consideration for the original taking of land for the Casa Grande Highway in 1950 included agreement by the State that it would install and maintain seven crossovers for the benefit of the abutting properties. They further claim that the elimination of these crossovers constitutes a breach of this agreement, which would be a matter quite distinct from limiting access under the police power. Assuredly, the police power does not give the State authority to make and breach contracts with impunity. If the State considers it advantageous to agree to construct and maintain crossovers at the time of taking land as part of the consideration rather than pay the full and just compensation in money, it should not subsequently complain that it is being held to this agreement or to responding in damages for the breach thereof. In State ex rel. Herman v. Tucson Title Insurance Company, 101 Ariz. 415, 420 P.2d 286, we said:

"While it is true that the Highway Department has the right and power to abandon or change any part of the state highway system, Rowland v. McBride, 35 Ariz. 511, 281 P. 207 (1929) the state must respond in damages if it acquires property in consideration of an agreement to construct an interchange and thereafter fails to construct such interchange. State v. McDonald, 88 Ariz. 1, 352 P.2d 343 (1960); Williams v. North Carolina State Highway Commission, 252 N.C. 772, 114 S.E.2d 782 (1960)."

It is no less a breach of agreement to fail to maintain crossovers than to fail to construct an interchange.

In apparent anticipation, the State in its brief claims:

"Since it is clear that the property owners have no vested right in the crossovers themselves, the most they can claim is that the State breached its contract to maintain the crossovers. What is the measure of damages in such case? Clearly it is the value of the right at the time the property was originally deeded to the State."

Such a rule of retroactive damages would allow the State to speculate in land values to the detriment of the property owners. We therefore hold that, as a matter of law,

the State breached its agreement and the measure of damages, if any, should be computed, in accordance with the rule we have set forth herein, at the time that the breach occurred.

In view of our disposition of this matter, it is unnecessary to consider the appellant's contention that the trial court erred in granting the motion for a new trial.

The decision of the Court of Appeals is vacated. The order of the Superior Court is set aside. The judgments of the Superior Court are reversed, and the matter remanded for further proceedings consistent with this decision.

LOCKWOOD, C. J., STRUCKMEYER, V. C. J., and UDALL and HAYS, JJ., concur.